FILED

2004

US DISTRICT COURT, EDNC
BY________DEP CLERK

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KENNETH D. VINCENT and BARBARA WISNIEWSKI, Derivatively on behalf of aaiPharma, Inc, A Delaware Corporation,<br><br>Plaintiffs<br><br>v.<br><br>FREDERICK D. SANCILIO; JAMES L. WATERS; WILLIAM H. UNDERWOOD; JOHN M. RYAN; JAMES G. MARTIN; JOSEPH H. GLEBERMAN; RICHARD G. MORRISON; JOHN E. AVERY; and KURT M. LANDGRAF<br><br>Defendants<br><br>-and-<br><br>AAIPHARMA INC., A Delaware Corporation,<br><br>Nominal Defendant. | **No.** 7:04-CV-166-FL(1)<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, by their undersigned attorneys, for their shareholder derivative complaint, allege upon information and belief, except as to allegations about themselves, which are based upon personal knowledge, as follows:

## NATURE OF ACTION

1. This is a shareholder derivative action brought on behalf of nominal defendant aaiPharma Inc. ("aaiPharma" or "the Company"), a Delaware corporation with headquarters and principal place of business in Wilmington, North Carolina. In this action, plaintiffs, on behalf of aaiPharma, alleges that defendants, who are officers and/or directors of the Company, damaged aaiPharma by deliberately, in bad faith or recklessly: (i) implementing a sham system of internal controls completely inadequate to ensure proper recognition of revenue; (ii) causing the Company to issue false and misleading statements to the market regarding the Company's

earnings and revenues; (iii) exposing the Company to massive liability for securities fraud; (iv) damaging the Company's reputation: and (v) trading aaiPharma shares while in possession of material, non-public information regarding the true financial condition of the Company.

2. On March 1, 2004, aaiPharma announced that "the Board of Directors has become aware of unusual sales in the Company's Brethine and Darvocet product lines during the second half of 2003. The Company has appointed an independent committee of its Board of Directors to conduct an inquiry into these matters . . . . The Company believes these matters will materially affect its previously announced guidance for the first quarter and full year of 2004 and is withdrawing its guidance for these periods, and these matters may, depending on the results of the inquiry, require an adjustment to the 2003 financial results." Prior to disclosing these adverse facts, certain insiders sold approximately $1 million of their personal holdings of aaiPharma shares. Immediately following the March 1, 2004 announcement, shares of the Company's stock fell as low as $9.90 per share, a decline of over 35%. On April 27, 2004, the Company confirmed that it would restate the first three quarters of Fiscal 2003, reducing recognized revenue and ultimately changing **previously reported 2003 diluted earnings of $1.17 per share into a loss of ($1.18).** As alleged in detail herein, these revelations have severely damaged aaiPharma.

3. Defendants' conduct was deliberate and undertaken in bad faith, and constituted breaches of their fiduciary duties to the Company. The acts and omissions alleged herein occurred during the period between January 1, 2002 and March 1, 2004, inclusive (the "Relevant Period"). By making aaiPharma appear more successful than it actually was, defendants secured their positions as officers and/or directors of a public company, as well as their continued lucrative employment and incentive-based cash and stock compensation. Defendants were also motivated by the desire to sell their personal holdings of aaiPharma stock and increase and maintain the value of their substantial personal holdings of aaiPharma shares.

## JURISDICTION AND VENUE

4. This Court has diversity jurisdiction over this action pursuant to pursuant to 28 U.S.C. Section 1332.

5. Venue is proper in this Judicial District because many of the acts and transactions alleged herein occurred in substantial part in this judicial district.

## PARTIES

6. Plaintiff Kenneth D. Vincent held aaiPharma shares during the Relevant Period, and continues to hold aaiPharma shares. Mr. Vincent is a citizen of Tennessee.

7. Plaintiff Barbara Wisniewski held aaiPharma shares during the Relevant Period, and continues to hold aaiPharma shares. Ms. Wisniewski is a citizen of California.

8. Mr. Vincent and Ms. Wisniewski are sometimes collectively referred to herein as "plaintiffs."

9. Nominal Defendant aaiPharma is a Delaware corporation and maintains its principal executive offices at 2320 Scientific Park Drive, Wilmington, North Carolina 28405. According to its public statements, aaiPharma is a science-based, specialty pharmaceutical company focused on acquiring, improving and marketing well-known, branded medicines in pain management and critical care. The Company also offers comprehensive drug development services to the pharmaceutical, biotechnology, generic and device industries through its development services division. aaiPharma trades on the NASDAQ National Market System with approximately 28.58 million shares outstanding.

10. Defendant Frederick D. Sancilio ("Sancilio") is the Company's founder and has at all relevant times been Chairman of the Board of Directors. Sancilio was the Company's CEO until July 2002, when he became the Company's Chief Scientific Officer. When former Company CEO and president Phillip S. Tabbiner resigned on March 29, 2004, Sancilio resumed the position of CEO. Under the terms of his employment contract, Sancilio was eligible for and did in fact receive performance-based bonuses based in part on the Company's materially false reported financial statements. Sancilio made several false and misleading public statements

during the Relevant Period and signed and certified as true aaiPharma reports on Form 10-Q and 10-K issued during the Relevant Period that now must be restated. Sancilio beneficially owns 6.1 million shares of the Company's common stock, or over 21% of the Company. Sancilio is a citizen of Florida.

11. Defendant James L. Waters ("Waters") served as a director of the Company since 1981 and as a non-employee officer from 1982 until 1996. Waters is a private investor in numerous companies, is president of Cetek Corporation, a drug discovery company, Secretary of Trans-Tek, Inc., an instrument measurement company, and is the founder of Waters Associates, Inc., now known as Waters Corporation, a scientific instrumentation manufacturer. As publicly reported on March 2, 2003, Waters beneficially owns over 3.2 million shares (over 11%) of the Company's outstanding stock. Waters serves on the independent committee announced on March 1, 2004 to investigate unusual sales of certain of the Company's products. Waters is a citizen of Massachusetts.

12. Defendant William H. Underwood ("Underwood") has been a director of the Company since 1996. He is currently Executive Vice President, Corporate Development of the Company, and has served as Chief Operating Officer from 1995 to 1997, as Executive Vice President since 1992, and as Vice President from 1986 to 1992. He has held positions in the pharmaceutical and cosmetic industries for more than 17 years, in positions including Director of Quality Assurance and Director of Manufacturing at Mary Kay Cosmetics, Inc. and Group Leader of Bacteriological Quality Control at Burroughs-Wellcome Co. During the Relevant Period, Underwood sold approximately 70,000 shares of AaiPharma common stock, realizing $983,000 in proceeds while in possession of material, non-public information concerning the Company's true financial performance and business prospects. Under the terms of his employment contract, Underwood was eligible for and did in fact receive performance-based bonuses based in part on the Company's materially false reported financial statements. Underwood is a citizen of North Carolina.

13. Defendant John M. Ryan ("Ryan") has served as a director of the Company since 1996. Mr. Ryan serves as managing partner of Ryan Partners, a business advisory and venture

capital firm he founded in July 1996 and vice president of Cetek Corporation, a drug discovery company of which director Waters is president and a substantial shareholder. Prior to founding Ryan Partners, Mr. Ryan served as a partner of Coopers & Lybrand, LLP (now PricewaterhouseCoopers LLP), an accounting firm, with which he was associated from 1972 to 1996. Mr. Ryan has served as a director of numerous private companies and as an officer and director of several not-for-profit corporations. Ryan serves on the Board's Audit and Compensation Committees and serves on the independent committee announced on March 1, 2004 to investigate unusual sales of certain of the Company's products. Ryan is an officer of Cetek, which due to AaiPharma director Waters' ownership interest in Cetek and Waters' beneficial ownership of approximately 11.5% of the outstanding shares of the Company's Common Stock, technically qualifies Cetek as an affiliate of aaiPharma and thus calls into question Ryan's independence under the NASDAQ rules and his ability to serve on the Company's Audit Committee. The Company's board unanimously waived Ryan's conflict of interest and permitted him to serve on the Company's Audit Committee. Ryan is a citizen of Massachusetts.

14. Defendant James G. Martin ("Martin") has served as a director of the Company since 1999. Martin serves on the Board's Audit, Executive and Corporate Governance, and Compensation Committees and serves on the independent committee announced on March 1, 2004 to investigate unusual sales of certain of the Company's products. Martin has served since 1995 as Corporate Vice President and since 1993 as Chairman of the Research Development Board of Carolinas HealthCare System, a regional healthcare system. Prior to joining Carolinas HealthCare, Martin served as Governor of the State of North Carolina from 1984 to 1992. Martin also serves as a director of Duke Energy Corporation, Palomar Medical Technologies, Inc., and Family Dollar Stores, Inc. Martin is a citizen of North Carolina.

15. Defendant Joseph H. Gleberman ("Gleberman") has served as a director of the Company since 1995. Gleberman has been employed by Goldman, Sachs & Co., an investment-banking firm, since 1982 and has been a Partner of Goldman, Sachs & Co. since 1990 and as Managing Director since 1996. Gleberman serves as a director of BackWeb Technologies Ltd.,

Berry Plastics Corporation, IPC Acquisition Corp. and MCG Capital Corporation. Pursuant to a stockholders' agreement entered into in connection with a 1995 investment in the Company, certain Goldman Sachs investment partnerships have the right to designate one member of the Company's Board of Directors for as long as the investment partnerships collectively own at least 10% of the Company's outstanding Common Stock. Gleberman is their nominee. Gleberman serves on the independent committee announced on March 1, 2004 to investigate unusual sales of certain of the Company's products. Gleberman is a citizen of New York.

16. Defendant Richard G. Morrison ("Morrison") has served as a director of the Company since 1999. Morrison serves on the Board's Audit and Executive and Corporate Governance Committees and serves on the independent committee announced on March 1, 2004 to investigate unusual sales of certain of the Company's products. Prior to his retirement in May 2001, Morrison was an Adjunct Professor of Business at the Cameron School of Business, University of North Carolina at Wilmington for over six years. Morrison also has more than 30 years of pharmaceutical industry experience, recently acting as a private consultant for medium-sized international pharmaceutical businesses, and having served as General Manager and President of Eli Lilly's operations in Venezuela, Mexico and Brazil. Morrison is a citizen of North Carolina.

17. Defendant John E. Avery ("Avery") has served as a director of the Company since 2000. Avery serves on the Board's Compensation and Executive and Corporate Governance Committees and serves on the independent committee announced on March 1, 2004 to investigate unusual sales of certain of the Company's products. Avery is a retired senior executive of Johnson & Johnson, a multinational healthcare products company, having served as Company Group Chairman of all operations in Latin America and the Caribbean. Avery served from 1993 to 1996 as Chairman of each of the Americas Society and the Council of the Americas, each a non-profit organization. Avery is a citizen of North Carolina.

18. Defendant Kurt M. Landgraf ("Landsgraf") has served as a director of the Company since 2001. Landgraf serves on the Board's Compensation and Executive and Corporate Governance Committees and serves as chairman of the independent committee

announced on March 1, 2004 to investigate unusual sales of certain of the Company's products. Landgraf has served since August 2000 as the President and Chief Executive Officer of the Educational and Testing Service in Princeton, New Jersey, a private educational testing and measurement organization. He served in various positions at E.I. Dupont de Nemours Company and its affiliates from 1980 until 2000, including Chairman and Chief Executive Officer of Dupont Pharmaceuticals Company from January 2000 to May 2000, Executive Vice President and Chief Operating Officer from April 1998 to August 2000, Executive Vice President from November 1997 to April 1998, and Chief Financial Officer from December 1996 to October 1997 of E.I. Dupont de Nemours and Company. Landgraf serves as director of IKON Office Solutions, Inc., and NDC Health Corporation. Landgraf is a citizen of New Jersey.

19. Defendants Sancilio, Waters, Underwood, Ryan, Martin, Gleberman, Morrison, Avery and Landgraf are sometimes collectively referred to as the "Director Defendants."

20. Defendants Underwood and Sancilio are sometimes collectively referred to as the "Insider Trading Defendants."

21. Defendant William L. Ginna, Jr. ("Ginna") commenced employment with the Company in February 2000, and served as the Company's Executive Vice President and Chief Financial Officer at all relevant times. Ginna resigned from these positions on May 11, 2004. Under the terms of his employment contract, Ginna was eligible for and did in fact receive performance-based bonuses based in part on the Company's materially false reported financial statements. Ginna made several false and misleading public statements during the Relevant Period, and signed and certified as true aaiPharma reports on Form 10-Q and 10-K issued during the Relevant Period that now must be restated. Ginna is currently being paid $6,173 per week as a consultant to the Company under a one-year contract. Ginna's contract is worth a total of $320,996. Ginna is a citizen of North Carolina.

22. Defendant Phillip S. Tabbiner ("Tabbiner") was Company CEO and President from July 2002 until he resigned on March 29, 2004. He served as President and Chief Operating Officer from February to June 2002, as Executive Vice President of aaiPharma and President of the Company's Pharmaceutical Division from November 2000 to January 2002.

Under the terms of his employment contract, Tabbiner was eligible for and did in fact receive performance-based bonuses based in part on the Company's materially false reported financial statements. Tabbiner made numerous false and misleading public statements during the Relevant Period, and signed and certified as true aaiPharma reports on Form 10-Q and 10-K issued during the Relevant Period that now must be restated. Tabbiner is currently being paid $10,615 per week as a consultant to the Company through a 15-month agreement that ends in June 2005. Tabbiner's contract is worth more than $635,000. Tabbiner is a citizen of North Carolina.

23. The Director Defendants and defendants Ginna and Tabbiner are sometimes collectively referred to as "the Individual Defendants."

24. Each of the Individual Defendants, by virtue of his management and/or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto. As corporate fiduciaries, the Individual Defendants were required to exercise reasonable care and prudent supervision of the Company, including assuring the dissemination of truthful information concerning the business, operations, and financial reporting of aaiPharma.

25. The Individual Defendants were required to supervise the preparation of aaiPharma' SEC filings and approve any reports concerning the company's financial condition and results of operations, including to assure that the Company complied with Generally Accepted Accounting Principles ("GAAP"). The Individual Defendants likewise had a duty of loyalty to the company to act in the best interests of the company and its shareholders.

26. Each of the Individual Defendants directly participated in the management of the Company and/or was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein, and/or was aware that the false and misleading statements were being issued regarding the Company's financial position and approved or ratified these statements.

27. Because of each of the Individual Defendants' positions with aaiPharma, each knew and had access to non-public information about the business of aaiPharma, as well as its

finances, markets, and present and future business prospects, via access to internal corporate documents (including aaiPharma's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and committees thereof, and reports and other information provided to him in connection therewith.

28. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding aaiPharma or to abstain from trading on such information.

## SUBSTANTIVE ALLEGATIONS

29. On December 13, 2001, defendants caused the Company to issue a press release announcing that AaiPharma had acquired the Brethine product line of asthma medications from Novartis Pharmaceuticals Corporation. In December 2001, defendant Tabbiner was the president of the aaiPharma division responsible for marketing Brethine.

30. On April 24, 2002, defendants caused the Company to issue a press release announcing a net loss of ($0.17) per diluted share for the quarter ending March 31, 2002. On May 15, 2002, defendants caused the Company to file its Form 10-Q for the quarter ending March 31, 2002 that reported the same financial results. The 10-Q was signed by defendants Ginna and Sancilio.

31. On July 24, 2002, defendants caused the Company to issue a press release announcing net income for the quarter ending June 30, 2002 of $0.32 per diluted share. The press release also forecast third quarter net earnings of $0.36 to $0.38 per diluted share. On August 14, 2002, defendants caused the Company to file its Form 10-Q for the quarter ending June 30, 2002 that reported the same financial results. The 10-Q was signed by defendants Ginna and Tabbiner and included a Sarbanes-Oxley statement certifying the fair presentation of the financial results in the report.

32. On November 14, 2002, the defendants caused the Company to file its Form 10-Q for the quarter ending September 30, 2002 that reported a net income of $0.38 per diluted share.

The report was signed by defendants Ginna and Tabbiner and certified by defendants Sancilio, Ginna, and Tabbiner.

33. On January 28, 2003, defendants caused the Company to issue a press release announcing fourth quarter 2002 net income of $0.39 per diluted share and year end 2002 net earnings of $0.92 per diluted share. The press release also gave the following guidance:

> For the first quarter of 2003, The Company expects revenues of between $62 and $65 million and earnings per diluted share between $0.35 and $0.38. The Company continues to expect full year 2003 revenues and earnings per diluted share to be between $270 million and $275 million, and between $1.53 and 1.58 per share, respectively.

34. All the statements and public filings regarding aaiPharma's 2002 financial results were materially false and misleading because the defendants had permitted the Company to improperly account for the acquisition of major new product lines as business combinations, instead of properly accounting for such acquisitions as acquisitions of assets that do not constitute a business. This conduct resulted in the restatement of all four quarters of 2002 and the overall reduction of 2002's previously reported net earnings by ($0.15) per diluted share, a reduction of over 16%.

35. On April 21, 2003, defendants caused the Company to issue a press release announcing aaiPharma's "record" financial results for the first quarter of 2003, the period ended March 31, 2003. aaiPharma reported revenues of $64 million and net income of $7.2 million or $0.25 per diluted share:

> Wilmington, N.C., April 21, 2003 - aaiPharma Inc. (Nasdaq:AAII), a science-based specialty pharmaceutical company, today reported financial results for the three-month period ended March 31, 2003. Total revenues for the first quarter of 2003 increased 40% to $64.0 million, compared with $45.6 million reported for the first quarter of 2002. For the quarter, the Company reported net income of $7.2 million, or $0.25 per diluted share, as compared to income before extraordinary loss of $2.1 million, or $0.07 per diluted share, in the 2002 first quarter.
>
> Dr. Philip S. Tabbiner, President and Chief Executive Officer, stated, "In addition to aaiPharma's strong financial performance for

the first quarter, the Company achieved several key milestones with the expansion of our sales force to 80 professionals as well as the marketing approval and launch of Azasan 75 and 100 mg and our Calcitriol vial. In addition, the Company is on track to launch its first Darvon line extension and file a supplemental new drug application (sNDA) for Brethine in the second quarter. Azasan, Calcitriol and our pain management line extensions as well as continued success with our core brands will be drivers of the Company's organic revenues growth over the next three quarters."

Financial Results

Product sales revenues of $40.0 million increased 98% during the first quarter of 2003 versus the first quarter of 2002, primarily due to sales of the Darvon/Darvocet-N family of products, which the Company acquired in late March of 2002. Gross margins for pharmaceutical products were 75% for the first quarter ended March 31, 2003, reflecting an improvement of approximately 14 percentage points versus the prior year quarter, primarily due to sales mix.

Product development revenues (royalties and fees) for the first quarter of 2003 represented 6% of overall Company revenues, or $3.8 million, as compared to $2.1 million for the first quarter of 2002. Product development revenues remain in line with management's expectations. Development services revenues for the first quarter of 2003 were $20.2 million, as compared to $23.3 million in the prior year period.

While in absolute terms, selling, general and administrative expenses were higher than the prior year quarter, on a percentage of revenues basis, they represented 28% percent in the quarter, compared to 29% in the prior year quarter.

Income from operations for the first quarter of 2003 increased by $12.1 million, versus the first quarter of 2002, to $17.2 million and was 27% of revenues. Net cash provided by operating activities for the first quarter of 2003 was $15.3 million.

Days' sales outstanding (DSOs) were a record low of 40 days at March 31, 2003, improving upon the prior record of 44 days established at December 31, 2002.

Since March 31, 2002, the Company has repaid $60.4 million of senior bank debt, including an additional $8.5 million during the first quarter of 2003, providing $34.0 million in borrowing availability as of March 31, 2003. The total leverage ratio, or total debt divided by income from operations plus depreciation and

amortization, at quarter-end was 3.4x, compared to 4.2x at March 31, 2002. At March 31, 2003, aaiPharma's cash position was $10.7 million.

Outlook
aaiPharma also updated its financial guidance for 2003 as follows:

| **Revenues and Earnings Per Share (EPS) Guidance** | **Q2 2003 Ranges** | **Full Year 2003 Ranges** |
|---|---|---|
| Product Sales: | | (millions) |
| Pain Management | | $65 to $67 |
| Critical Care | | $106 to $110 |
| Commercial Manufacturing | | $4 to $5 |
| Product Development | | $14 to $15 |
| Development Services | | $91 to $93 |
| **Total Revenues** | | **$280 to $290** |
| Diluted EPS | $0.26 to $0.28 | $1.11 to $1.17 |

36. On May 14, 2003, defendants caused the Company to file its Form 10-Q for the first quarter of 2003 with the SEC, which confirmed the previously-announced financial results and was signed and certified by defendants Sancilio, Tabbiner, and Ginna. The Form 10-Q stated:

> The accompanying unaudited consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States and applicable Securities and Exchange Commission regulations for interim financial information. These financial statements do not include all of the information and footnotes required by accounting principles generally accepted in the United States for annual financial statements.

37. The Form 10-Q for the first quarter of 2003 reaffirmed defendants' prior representations regarding revenue recognition from the Company's 10-K for the year ending 2002, as follows:

> Revenue Recognition.
> Net Revenues. Our net revenues represent our total revenues less

allowances for customer credits, including estimated discounts, product returns and non-research and development expenses reimbursed by customers. We accept returns of expired products.

Product Sales. We recognize revenues for product sales at the time our products are shipped.

38. On July 23, 2003, defendants caused the Company to issue a press release announcing "record" second quarter 2003 financial results. Defendants reported revenues of $70.8 million and net income of $8 million or $0.28 per diluted share:

**Second Quarter 2003 Highlights**

**Revenues Increase 15% over the Prior Year Quarter to $70.8 Million**

**Pharmaceutical Product Sales Increase to $45.8 Million**

**Earnings Rise to $0.28 Per Diluted Share, an Increase of 33% over the Second Quarter of 2002**

**Launched Darvon® Compound 32, the Company's First Darvon®/Darvocet™ Line Extension**

Wilmington, N.C., July 23, 2003 - aaiPharma Inc. (Nasdaq:AAII), a science-based specialty pharmaceutical company, today reported financial results for the second quarter ended June 30, 2003.

"Our positive second quarter financial performance was driven by strong revenue growth in our pharmaceutical products division," stated Dr. Philip S. Tabbiner, President and Chief Executive Officer. "We are very pleased with the strategic and operational milestones we achieved in the first six months of 2003 which reflect our continued focus on our core strategy of being a science-based, specialty pharmaceutical company."

Financial Results

Total revenues for the second quarter were $70.8 million, representing organic growth of 15% above the $61.4 million recorded in the second quarter of 2002. For the six-month period ended June 30, 2003, revenues increased 26% to $134.8 million, compared with revenues of $107.1 million in the first half of 2002. Net income and earnings per diluted share increased 31% to $8.0 million and 33% to $0.28, respectively, as compared to the second quarter of 2002, driven by a continued shift toward higher margin pharmaceutical products. The Company reported net income of $15.1 million for the first half of 2003, or $0.53 per diluted share, an increase of 85% over income before extraordinary loss in the year ago period of $8.2 million, or $0.29 per diluted share.

Gross margin (excluding depreciation) for the second quarter of 2003 improved 12% to $45.2 million, compared with $40.4 million last year. Selling, general and administrative expenses represented 28% of net revenues in the second quarter of 2003, up from 26% in the 2002 quarter, primarily driven by the build-out of our pharmaceutical sales force. Research and development spending was on plan at $5.6 million, or 8% of total revenues for the quarter.

aaiPharma's strong second quarter product sales reflected market share gains of M.V.I. Pediatric®, increased demand for Brethine® injectable and continued performance in line with expectations for our pain management franchise. Product sales grew organically to $45.8 million, an increase of 32% versus the same period in 2002. Sequentially, product sales were up 14% over the first quarter of 2003. Product sales, including the acquisition of the Darvon®/Darvocet™ family late in the first quarter of 2002, increased 56% to $85.8 million in the first six months of 2003 as compared with the same period in 2002. Product development revenues (royalties and fees) remain in line with management's expectations at $3.9 million for the second quarter 2003. Development services revenues for the second quarter of 2003 increased to $21.1 million, as compared to $20.3 million in the prior year period, driven primarily by increased demand for our analytical services and contract manufacturing capabilities.

During the second quarter of 2003, the Company paid down an additional $8.5 million of debt, bringing the amount of debt repaid to $17.0 million for the first six months of 2003. By the end of the quarter, the Company again reduced its total leverage ratio as a result of increasing earnings before interest, taxes, depreciation and

amortization, and decreasing its debt balance. At June 30, 2003, aaiPharma's cash position was $8.1 million.

Business Highlights

Subsequent to the end of the second quarter, on July 17, 2003, aaiPharma announced the acquisition of a unique Darvocet™ line extension from Athlon Pharmaceuticals. Upon FDA approval, which is expected before the end of this year, this unique line extension is expected to be the only propoxyphene napsylate/acetaminophen combination product on the market offering this particular dose combination. The total propoxyphene market, generic and branded, is valued at more than $500 million, according to 2002 Verispan data. This new, unique Darvocet™ line extension is expected to add substantial value to aaiPharma's growing pain management franchise.

On June 24, 2003, aaiPharma launched its first line extension of the Darvon®/Darvocet™ family, Darvon® Compound 32 (propoxyphene hydrochloride, aspirin and caffeine). Darvon® Compound 32 offers a lower dose (i.e., 32 mg of propoxyphene) alternative to Darvon® Compound 65 (i.e., 65 mg of propoxyphene), providing physicians with more options and increased titration flexibility to aid in the management of headache pain.

"In the last fifteen months since we acquired the Darvon®/Darvocet™ franchise from Eli Lilly & Company, we have successfully executed our strategy to grow the prescription volume for the semi-exclusive products and slow the decline of the genericized portion of the franchise while also progressing with the development of key line extensions to the portfolio," indicated Dr. Tabbiner. "Furthermore, we remain on track to launch another Darvon® line extension, separate from the recently announced Darvocet™ acquisition, before the end of this year. We believe that these factors, coupled with our continued sales force expansion and targeted pain management promotional campaigns, substantiate continued revenue growth for the Darvon®/Darvocet™ brand family, consistent with our strategic objectives."

On June 25, 2003, the Company filed a supplemental new drug application (SNDA) for Brethine® Ampuls with the U.S. Food and

> Drug Administration (FDA) seeking approval for a new and safer vial presentation of injectable Brethine® and certification of aaiPharma's sterile manufacturing facility in Charleston, South Carolina as an alternate production site for the product.
>
> On April 16, 2003, aaiPharma announced the acquisition of the exclusive rights to a parenterally administered methadone product, formerly branded as Dolophine® Hydrochloride Injection, from Roxane Laboratories, Inc. The Company remains on plan for re-branding this product under a new trade name and launching it in 2003. This acquisition expands aaiPharma's pain management product offerings into the severe pain, Schedule II class of pain products while also complementing its existing portfolio of hospital-based injectable products.
>
> Outlook
>
> The Company updated financial guidance for the 2003 third quarter by stating that earnings per diluted share are expected to be in the range of $0.28 to $0.30.

39. On August 14, 2003, defendants caused the Company to file its Form 10-Q for the second quarter of 2003 with the SEC, which confirmed the previously-announced financial results and was signed and certified by defendants Sancilio, Tabbiner, and Ginna. Specifically, defendants Sancilio, Tabbiner, and Ginna certified that

> the quarterly period ending June 30, 2003 fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 780(d)) and that information contained in this report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

40. On October 22, 2003, defendants caused the Company to issue a press release touting its "record" third quarter 2003 financial results. Defendants reported revenues of $71 million and net income of $8.9 million or $0.31 per diluted share:

> **aaiPharma Inc. Reports Record 2003 Third Quarter Financial Results**

Highlights:

Revenue increase of 16% over the 2002 quarter to $71.0 Million

Earnings rise to $0.31 per diluted share, an increase of 24% over the 2002 third quarter

Launched Darvocet A500™, the Company's first significant line extension

Wilmington N.C., October 22, 2003 - aaiPharma Inc. (NASDAQ: AAII), a science-based pharmaceutical company, today announced financial results for the third quarter and nine month period ended September 30, 2003.

Total revenues for the third quarter ended September 30, 2003 increased 16% to $71.0 million as compared to $61.2 million recorded in the comparable 2002 period. Net income for the 2003 third quarter rose 26% to $8.9 million, or $0.31 per diluted share, versus $7.1 million, or $0.25 per diluted share, for the 2002 third quarter. For the first nine months of 2003, total revenues increased 22% over the year-ago period to $205.8 million compared with total revenues of $168.3 million in the first nine months of 2002. Net income for the 2003 nine-month period was $24.1 million, or $0.84 per diluted share, more than double net income for the 2002 nine-month period of $10.0 million, or $0.35 per diluted share.

The Company reported cash and cash equivalents of $11.1 million at September 30, 2003 as compared to $8.1 million at June 30, 2003, after the repayment of an additional $12.5 million of debt during the third quarter of 2003. For the nine months ended September 30, 2003, the Company has repaid a total of $29.5 million of debt. In the third quarter, net cash provided by operating activities was $19.6 million and capital expenditures were $3.4 million.

Earlier today, aaiPharma announced an agreement to acquire a portfolio of pain products from Elan Corporation, plc. Upon expected completion of this transaction in the fourth quarter of 2003, Roxicodone, Oramorph SR, and Roxanol™, will mark aaiPharma's first entry into the moderate to severe category of pain management products. These Schedule II products, plus the unscheduled injectable pain treatment Duraclon, complement the Company's strategy to focus its efforts more specifically in the

pain management category and offer a broad array of prescription products for the treatment of pain as identified in the World Health Organization's Pain Ladder.

> "We are pleased with our third quarter financial results reflecting another period of strong and consistent year-over-year growth," commented Dr. Philip S. Tabbiner, President and CEO of aaiPharma. "The recent approval and national launch of Darvocet A500™ is a significant milestone for our business. Darvocet A500™ marks the first major pharmaceutical launch undertaken by aaiPharma, and we are very pleased with the initial feedback we are receiving from physicians about the need for this lower acetaminophen alternative to the current Darvocet™ offering. Darvocet A500™, coupled with our planned acquisition of the pain portfolio from Elan, underscores our strategy to focus our efforts on the pain management category and will provide us with a complementary portfolio of products that we can leverage with our growing sales and marketing organization."

> Outlook:

> Based on current trends, the Company continues to expect diluted earnings per share for 2003 to be between $1.11 and $1.17, and the net revenue range to be between $280 million and $290 million..

41. On November 14, 2003, defendants caused the Company to file its Form 10-Q for the third quarter of 2003 with the SEC, which confirmed the previously-announced financial results and was signed and certified by defendants Sancilio, Tabbiner, and Ginna. Specifically, defendants Sancilio, Tabbiner, and Ginna certified that the "quarterly period ending September 30, 2003 fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 780(d)) and that information contained in this report fairly presents, in all material respects, the financial condition and results of operations of the registrant." Defendants further represented:

> Item 4. Controls and Procedures

> (a) Evaluation of Disclosure Controls and Procedures — aaiPharma Inc.'s Executive Chairman, Chief Executive Officer and Chief Financial Officer have evaluated the Company's disclosure

controls and procedures as of September 30, 2003, and they concluded that these controls and procedures are effective.

(b) Changes in Internal Controls — There was no change in internal controls over financial reporting during or subsequent to the most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

42. On February 5, 2004, defendants caused the Company to issue a press release announcing its fourth quarter and year end 2003 financial results. Defendants reported fourth quarter revenues of $76.9 million and net income of $10.25 million or $0.34 per diluted share:

> Fourth quarter net revenues increased 24% to $76.9 million; full-year net revenues grew 23% to $282.7 million, driven by 40% growth in net revenues from product sales
>
> Fourth quarter earnings advanced to $0.34 per diluted share, a 31% increase over the 2002 period; full-year earnings increased to $1.17 per diluted share, up 92% over 2002
>
> Cumulative debt reduction of $36 million in 2003
>
> Wilmington N.C., February 5, 2004 - aaiPharma Inc. (NASDAQ: AAII), a science-based pharmaceutical company, today reported financial results for the fourth quarter and full-year of 2003.
>
> "We are pleased with our overall performance in 2003 and the progress that the Company has made in implementing its strategic and operating plan focused on pain management," said Dr. Philip S. Tabbiner, President and Chief Executive Officer. "Furthermore, we recognize that our future success will be driven by our ability to effectively advance product candidates in our R&D pipeline, successfully launch new products, promote existing products, and execute strategic licensing agreements, partnerships and product acquisitions."
>
> Net revenues for the fourth quarter of 2003 were a record $76.9 million, an increase of 24% over revenues of $62.2 million in the fourth quarter of 2002. Pharmaceutical products continued to drive

this favorable trend, with quarterly sales of $48.3 million, up 28% as compared to $37.7 million in the 2002 fourth quarter. Sales of Roxicodone®, Oramorph® SR and the other pain products acquired by the Company from Elan at the beginning of December 2003 more than accounted for this increase. Net revenues from product sales in the fourth quarter were negatively impacted by product returns of Brethine® injectable 100 pack sold during 2002, which were approximately $4.8 million in the quarter, a significantly greater level of returns than experienced in any prior quarter. Prior to the third quarter of 2003, as returns had not been significant, and differences between actual returns and estimated returns were immaterial, returns were charged in the quarter the product was returned. In the fourth quarter, return reserves were increased based on the Company's recent experience. The most significant addition to return reserves in the quarter was attributable to Brethine® 100 packs. Two of the Company's three major U.S. wholesalers have now depleted the majority of their 100 pack inventory. In addition, following the licensure of the exclusive rights to aaiPharma's 25 mg, 75 mg and 100 mg azathioprine products to Salix in the fourth quarter, the Company processed actual returns and established a returns reserve totaling $3.9 million, which covers the full amount of the remaining inventory of these products in the distribution chain. The aggregate effect of product returns and additions to product returns reserves reduced fourth quarter net revenues by $15.9 million.

Income from operations for the 2003 fourth quarter decreased 8% to $15.7 million compared with $17.0 million in the prior year period. Fourth quarter earnings advanced to $0.34 per diluted share, a 31% improvement over the 2002 period. The decline in income from operations for the 2003 fourth quarter was due primarily to the product returns discussed above and the investment in the accelerated build out of a national sales force. The increase in other income was primarily a result of the fees, net of merger-related fees and expenses, generated from the termination of the merger agreement with CIMA and proceeds related to the Company's investment in Endeavor Pharmaceuticals, which resulted from the acquisition of the assets of Endeavor Pharmaceuticals by Barr Laboratories.

For the year ended December 31, 2003, net revenues reached an all-time high of $282.7 million, compared to net revenues of $230.5 million in 2002, an increase of 23%. Net revenues from product sales for the 2003 full-year period were $179.7 million, up 40% as compared to $128.5 million in 2002. Year-over-year trends

remained stable with gross margin for 2003 of 65.7%. Income from operations for the full-year of 2003 increased to $69.4 million, or 25% above the 2002 level of $55.4 million. aaiPharma reported net income for full-year 2003 of $34.3 million, or $1.17 per diluted share, up 92% over 2002.

aaiPharma achieved a number of milestones during the course of 2003 as part of the Company's strategy to become a fully-aligned, science-based pharmaceutical company focused in pain management. "Although we have made the strategic decision to focus primarily in pain management, we plan to fully leverage our existing portfolio of critical care products as well as our intellectual property and development projects in critical care and gastrointestinal diseases for the benefit of physicians, patients and our shareholders," commented Dr. Tabbiner.

Selected highlights of these achievements include:

Submitted two New Drug Applications (NDAs) to the U.S. Food and Drug Administration (FDA) for M.V.I. Adult™. M.V.I. Adult™ is a reformulation of M.V.I.-12® in which concentrations of four vitamins are increased and vitamin K is added. The first NDA, regarding the single-dose and univial presentations of M.V.I. Adult™, was approved by the FDA on January 30, 2004. The remaining NDA filing, regarding the bulk pharmacy pack, continues to move forward within the FDA-approval process.

Submitted a Supplemental New Drug Application (SNDA) for a complementary M.V.I.® line extension in December 2003. The Company expects a response from the FDA within the next six months. For competitive reasons, the details of this filing remain confidential.

Acquired exclusive rights to a parenterally administered methadone product to treat severe pain, formerly branded as Dolophine® Hydrochloride Injection, from Roxane Laboratories, Inc. aaiPharma initiated limited sales of the product late in December under a supply schedule outlined by the FDA in order to address drug shortage concerns for the product. The Company received site approval for manufacturing the product in early January and is continuing to work with the Agency on updating the label and indication for the product.

Filed a SNDA for Brethine® Ampuls with the FDA in June 2003.

Acquired, received FDA approval of and launched Darvocet A500™ (propoxyphene napsylate and acetaminophen) for the management of mild to moderate pain. In the three months since launch, prescriptions and extended units are trending upward consistent with the Company's expectations.

Expanded the pharmaceutical sales force to 240 representatives by the end of 2003 through collaboration with Athlon Pharmaceuticals.

Acquired a portfolio of three brands of Schedule II pain products -- Roxicodone® (oxycodone hydrochloride) tablets and oral solutions, Oramorph® SR (morphine sulfate sustained-release) tablets, and Roxanol™ (morphine sulfate) oral solutions -- as well as a non-scheduled pain management product, Duraclon® (clonidine hydrochloride injection), from Elan Corporation, plc companies in December 2003.

Granted Salix Pharmaceuticals an exclusive license to market the 25 mg, 75 mg and 100 mg strengths of Azasan® (azathioprine). The agreement called for Salix to make a licensing payment to aaiPharma as well as an on-going royalty on net sales. aaiPharma will continue to manufacture the products and supply all of Salix's needs for the products.

During the fourth quarter of 2003, the Company announced the termination of its merger agreement with CIMA. As a result, the Company received an $11.5 million termination fee from CIMA, as provided in the terminated merger agreement, against which $5.9 million of merger-related fees and expenses were applied.

On January 15, 2004, aaiPharma announced that Aventis submitted a new drug application (NDA) to the FDA for Allegra-D® 24-hour tablets, a formulation developed with aaiPharma using a patented extended release drug delivery technology, ProSlo II™. Upon approval, aaiPharma will receive a milestone payment and royalties on sales of the product.

During 2003 and 2004, aaiPharma continued to incur legal fees and expenses in its ongoing omeprazole patent litigation against

Schwarz Pharma Inc., Schwarz Pharma AG, Kremers Urban Development Co. and certain affiliates (the KUDCO defendants). Omeprazole is the active ingredient used in Prilosec® sold by AstraZeneca and in the KUDCO defendants' generic equivalent of Prilosec®. The litigation has been brought under aaiPharma's U.S. Patent No. 6,268,385 and, following the filing of an amended complaint during 2003, U.S. Patent No. 6,326,384. These patents include, among other claims, claims directed to compositions and methods wherein certain isomeric characteristics of solid state omeprazole are essentially the same in formulated drug product as in its active ingredient. aaiPharma is seeking damages equal to a reasonable royalty on all infringing sales by the KUDCO defendants since commercial launch of their generic substitute for Prilosec® on December 9, 2002 through the date of a judicial decision in the litigation, and a permanent injunction on subsequent sales thereafter absent KUDCO taking a license, among other remedies, in the event that aaiPharma ultimately prevails in the litigation. The KUDCO defendants have publicly confirmed sales of their generic omeprazole product from launch through the first nine months of 2003 of approximately $949 million.

"After a year of litigation, we are now well advanced in the discovery phase and have a court date set for the first months of 2005," stated Dr. Fred Sancilio, Executive Chairman and Chief Scientific Officer. "Given our extensive experience with and robust science around omeprazole compounds and the strength of our associated patent estate, we intend to continue to vigorously pursue the litigation."

Outlook:

aaiPharma's expectations for 2004 financial performance remain substantially unchanged. The Company expects net revenues for 2004 to be between $340 million and $355 million. Diluted earnings per share for 2004 are expected to remain, as previously disclosed, between $1.45 and $1.52. Based on current trends, milestones achieved and other developments, the Company expects to generate earnings of $0.27 to $0.30 per diluted share during the first quarter of 2004.

43. In response to this news, the price of Company stock declined approximately 24% on unusually high volume.

44. Each of the statements regarding the Company's financial results for all quarters of 2003 were false as they failed to disclose and/or misrepresented the following material adverse facts: (a) that defendants had improperly and untimely recognized revenue on certain of the Company's customer transactions; (b) that defendants violated GAAP and the Company's own internal policies regarding the timing of revenue recognition and providing adequate reserves for product returns; (c) that the Company's earnings guidance for 2003 and 2004 was materially false and misleading and lacked any reasonable basis when made, and (d) as a result, the Company's revenues, net income and earnings per share published during the Relevant Period were materially false and misleading.

## THE TRUTH EMERGES

45. On March 1, 2004, the defendants caused the Company to announce that it was convening an "independent committee" of the board to investigate "unusual sales:"

> **aaiPharma Board of Directors Announces Independent Inquiry**
>
> Wilmington, N.C., March 1, 2004 -- The Board of Directors of aaiPharma Inc. (NASDAQ: AAII) announced that subsequent to the issuance of the Company's press release announcing its 2003 financial results and in connection with the recently announced reorganization of the Company's management team, the Board of Directors has become aware of unusual sales in the Company's Brethine® and Darvocet™ product lines during the second half of 2003. The Company has appointed an independent committee of its Board of Directors to conduct an inquiry into these matters. The committee has retained King & Spalding LLP, an independent law firm, to assist in this investigation. The Company believes these matters will materially affect its previously announced guidance for the first quarter and full year of 2004 and is withdrawing its guidance for these periods, and these matters may, depending on the results of the inquiry, require an adjustment to the 2003 financial results.
>
> Dr. Frederick D. Sancilio, Chairman of the Board of Directors, indicated that "the Company will not comment further on these matters until the independent inquiry has been concluded. We do not presently know how long this process will take, and in light of

the March 15 filing deadline, this process could delay the filing of the Company's 2003 annual report on Form 10-K."

46. In response to the March 1, 2004 announcement, the Company's stock price fell approximately 35% to $9.90 per share on extremely high volume.

47. On April 27, 2004, defendants announced as follows:

**Independent Committee Completes Investigation**

Wilmington, N.C., April 27, 2004 - The Board of Directors of aaiPharma Inc. (NASDAQ: AAIIE) announced today that its independent committee has completed its previously announced investigation and presented its findings and initial recommendations to the Company's Board of Directors.

On March 1, 2004, the Board of Directors announced the formation of an independent committee consisting of all of the non-employee directors on the Board to conduct an inquiry into unusual sales in the Company's Brethine® and Darvocet™ product lines during the second half of 2003 that came to the attention of the Board following the February 2004 resignation of David M. Hurley, President of aaiPharma's Pharmaceuticals Division. The independent committee, with the assistance of its independent counsel, King & Spalding LLP, and the accounting firm Deloitte & Touche USA LLP, conducted an intensive investigation that took place over the span of nine weeks, and included a review of over one million pages of documents and the interview of over thirty-five aaiPharma employees, officers, directors and other parties.

In connection with the investigation, adjustments have been identified related to the recognition of revenue on certain transactions in 2003. These adjustments relate to (1) certain new product launches in the first three quarters for which aaiPharma provided extended rights of return; (2) a consignment sale transaction with a Puerto Rican distributor in the third quarter; (3) significant sales transactions in the third and fourth quarters with a new distributor of the Company's Brethine® product, and (4) certain sales in the fourth quarter of the 500-count bottles of Darvocet-N®100. The Company intends to restate its financial statements for the first three quarters of 2003 to reflect the revised accounting and revenue recognition for these transactions. While the results are currently still being reviewed, it is expected that the reduction of revenue recognized for 2003 will be a material amount, with a portion of that revenue expected to be realized in

2004.

The independent committee was chaired by Director Kurt M. Landgraf, President and CEO of Educational Testing Service. Mr. Landgraf has previously served as Chairman and CEO of Dupont Pharmaceuticals Company and Chief Financial Officer of E.I. Dupont de Nemours and Company, and is currently serving on the Boards and Audit Committees of IKON Office Solutions, Inc. and NDC Health Corporation. Also serving on the independent committee are directors James G. Martin, Ph.D., former Governor of North Carolina, Joseph H. Gleberman, a Managing Director of Goldman, Sachs & Co., John E. Avery, former senior executive of Johnson & Johnson, John M. Ryan, former partner of Coopers & Lybrand LLP, Richard G. Morrison, Ph.D., retired senior executive of Eli Lilly & Company, and James L. Waters, Chairman and CEO of Cetek Corporation.

"We are pleased to conclude our investigation into these 2003 issues," said independent committee Chairman Kurt M. Landgraf. "We believe the additional controls, employee training, and structural changes being instituted as a result of the independent committee's investigation will allow management and the Board greater visibility into sales transactions, which will enable us to keep much tighter control of transaction reporting." Mr. Landgraf added, "As planned, the Company will be providing additional detail about the findings and initial recommendations of the independent committee in its Form 10-K for 2003."

Now that the independent investigation is complete, the Company's auditor, Ernst & Young, is moving ahead to finalize its audit of aaiPharma's 2003 financial statements. Although the Company is working diligently with its auditor to file its Form 10-K for 2003, the Form 10-K cannot be filed until the audit process is complete. The Company intends to file its Form 10-Q for the first quarter of 2004 shortly after filing its 2003 Form 10-K.

The independent committee and the Board reiterated their intent to cooperate fully with any grand jury or SEC investigations relating to these matters.

48. On June 15, 2004, defendants finally caused the Company to file its Form 10-K for the year ended December 31, 2003. The filing revealed a huge restatement that resulted in the **previously reported 2003 diluted earnings per share of $1.17 becoming a loss of ($1.18).**

The 10-K also reported that 2002 would be restated, and earnings for 2002 would be reduced by $.15 per share:

> We are restating our financial statements for the year ended December 31, 2002 and for the first, second and third quarters of 2002 and 2003. This restatement is reported in this Annual Report on Form 10-K for the year ended December 31, 2003 and will be reported in amendments to our Quarterly Reports on Form 10-Q for the periods ended March 31, 2003, June 30, 2003 and September 30, 2003. This restatement:
>
> corrects the recognition of revenue for certain transactions in 2003 that did not satisfy all of the conditions for revenue recognition contained in SFAS 48 and/or SAB 101,
>
> increases reserves for product returns and makes other adjustments to our revenue reserves in 2003, and
>
> with respect to 2002 and 2003, changes the accounting for our major product line acquisitions which had been accounted for as business combinations to treat such acquisitions as acquisitions of assets that do not constitute a business.
>
> On February 27, 2004, our Board of Directors appointed a committee consisting of all of the non-employee members of our Board of Directors (the "Special Committee") to conduct an inquiry into unusual sales in our Brethine and Darvocet product lines during the second half of 2003. King & Spalding LLP, an independent law firm, and Deloitte & Touche USA LLP, as independent forensic accountants, were engaged to assist the Special Committee in this inquiry.
>
> In connection with the Special Committee's inquiry, we determined that certain matters required material adjustments to the 2003 financial information included in our February 5, 2004 press release and the financial information for the periods ended March 31, June 30, and September 30, 2003. The Special Committee's investigation and the adjustments from the Special Committee's inquiry are discussed in greater detail in this report in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Special Committee Investigation."

In addition to the accounting treatment adjustments identified in connection with the Special Committee's investigation, we have identified several other adjustments that affect the 2003 financial information that we had reported on February 5, 2004. These adjustments include:

a charge of $15.9 million due to the impairment of our Brethine intangible asset recorded in the fourth quarter of 2003;

a $4.7 million impairment charge in the fourth quarter of 2003 which represents the entire intangible asset recorded in the third quarter relating to the acquisition of Darvocet A500;

a $7.3 million increase in our returns reserve for sales of Brethine and Darvon/Darvocet products in the fourth quarter of 2003;

a $2.7 million increase in our inventory obsolescence reserve in the fourth quarter of 2003;

a $3.2 million increase in our chargeback reserve for sales in the fourth quarter of 2003 for our Oramorph product and other products; and

a valuation allowance of $10.0 million as an offset against our deferred tax asset as of December 31, 2003.

In addition to the 2003 adjustments arising in connection with the Special Committee's investigation and the additional adjustments identified above, we are restating our financial statements for the year ended December 31, 2002 and for the periods ended March 31, June 30, and September 30, 2002 and 2003 to treat each of our major product line acquisitions as acquisitions of assets that do not constitute a business. On January 14, 2004 and April 26, 2004, we received letters from the SEC's Division of Corporate Finance commenting on, asking questions about, and seeking additional disclosure with respect to, certain of our periodic reports. Following discussions with the Division of Corporate Finance and based on additional analyses, we have changed our accounting for these transactions from treating the acquisitions as business combinations to treating them as asset acquisitions. Accordingly, no portion of the purchase price for these acquisitions is allocated to goodwill, and the amount previously allocated to goodwill is instead allocated to the other identifiable acquired

> assets, including assets with definite lives. As a result, our direct costs in 2002 are greater than the amount previously reported by $6.8 million due to the increase in amortization expense resulting from a greater amount of purchase price being allocated to assets with definite lives, and our directs costs in 2003 are greater than the amount we reported in our February 5, 2004 press release for 2003 by $9.1 million.
>
> As a result of the foregoing, we have reduced our 2003 net revenue and diluted earnings per share by $57.7 million and $2.35, respectively, from the results we reported in our February 2004 press release. Our 2003 net revenues and diluted loss per share are $225.0 million and $1.18, respectively. For more detail on the adjustments we have made to the 2003 financial information that we had reported in our February 5, 2004 press release, see the table included in this report in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations — Restatement of Previously Issued Financial Statements" and Note 1 of Notes to Consolidated Financial Statements included elsewhere in this report. In addition, we have reduced our 2002 diluted earnings per share by $0.15 from the results reported in our annual report on Form 10-K for the year ended December 31, 2002 and are now reporting diluted earnings per share of $0.46. The financial results reported in this report have incorporated these adjustments.
>
> Until we amend our Quarterly Reports on Form 10-Q for the periods ended March 31, 2003, June 30, 2003 and September 30, 2003, the financial statements and related financial information contained in such reports should not be relied upon. In addition, we do not intend to file any amended Annual Report on Form 10-K or Quarterly Report on Form 10-Q for periods affected by the restatements that ended prior to March 31, 2003, and the financial statements and related financial information contained in such reports should no longer be relied upon.

49. On June 24, 2004, defendants finally caused the Company to file its Form 10-Q for the quarter ended March 31, 2004. The filing revealed that instead of **"generat[ing] earnings of $0.27 to $0.30 per diluted share during the first quarter of 2004"** as stated in the defendants' February 5, 2004 press release, **the Company actually suffered a quarterly loss of**

**($1.74 ) per diluted share.** Defendants also caused the Company to make this startling admission:

> The Company has carried out an evaluation, under the supervision and with the participation of its newly appointed Chief Executive Officer and interim Chief Financial Officer, pursuant to Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended, of the effectiveness of the design and operation of its disclosure controls and procedures as of March 31, 2004. Disclosure controls and procedures are to be designed to ensure that material information the Company must disclose in its reports filed or submitted under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported on a timely basis. As a result of that review, our Chief Executive Officer and interim Chief Financial Officer have concluded that, as of March 31, 2004, the Company's disclosure controls and procedures were not adequate.
>
> The internal control deficiencies related to, among other things, a lack of adequate policies with respect to revenue recognition, and a lack of sufficient control processes and procedures to effectively monitor and manage wholesaler inventory levels, to ensure adequate contract-approval oversight, and to ensure effective and timely communication among sales, marketing, finance and legal staff regarding the terms and conditions of certain transactions, including new product launches. Also, with respect to the sales of pharmaceutical products, the Company's finance and accounting personnel lacked adequate training on the application of revenue recognition principles and the establishment of product return reserves.
>
> In addition, in April 2004, in connection with their audit of the Company's consolidated financial statements for the year ended December 31, 2003, the Company's independent auditors identified and communicated to the Company and the Audit Committee two "material weaknesses" (as defined under standards established by the American Institute of Certified Public Accountants) relating to the Company's accounting and public financial reporting of significant matters and to its initial recording and management review and oversight of certain accounting matters. The material weaknesses were with respect to the calculation and procedures for the analysis of revenue reserves for product sales and lack of procedures for timely communications from the Legal Department and operating divisions to the Finance Department impairing the ability to properly evaluate the

accounting treatment for certain transactions the Company had entered into and assess the impact of such transactions in a timely manner. In addition, at that time, the Company's independent auditors identified and communicated to the Company and the Audit Committee a "reportable condition" (as defined under standards established by the American Institute of Certified Public Accountants) relating to the Company's internal controls over its financial reporting for investments. The reportable condition identified the Company's failure to perform a formal review of its investments and its failure to timely record patents or trademarks or to timely analyze the patents and trademarks for usefulness and possible impairment.

In view of the fact that the financial information presented in this Quarterly Report on Form 10-Q was prepared in the absence of adequate internal controls over financial reporting as of March 31, 2004, the Company devoted a significant amount of time and resources to the analysis of the financial information and documentation underlying the financial statements contained in this Quarterly Report. In particular, the Company reviewed significant product sales transactions to confirm the terms of the transaction and our accounting for the transaction, including whether all criteria for the recognition of revenue had been satisfied and whether we had properly estimated allowances for returns and other customer credits. In addition, the Company reviewed in detail each of the matters identified by the Special Committee of the Company's Board of Directors and its independent counsel and independent forensic accountants. The investigation of the Special Committee is discussed in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations–Special Committee Investigation" of the Company's 2003 Form 10-K.

In light of the foregoing, the Company has taken the following actions, in addition to those described above, after the end of 2003 to address the deficiencies as described above:

reassigned all financial controllers from operating units into the Finance Department reporting to the Company's Controller and Chief Accounting Officer who reports directly to the Chief Financial Officer;

commenced a company-wide education effort regarding our Code of Conduct and contract-approval policies;

implemented a more vigorous contract-
approval process;

implemented formal revenue recognition protocols and training programs; and

contracted with a third-party consulting group, FTI Consulting, to provide transitional management services in the area of operations and finance.

In addition, since December 31, 2003, the Company's then Chief Executive Officer, Chief Operating Officer and Chief Financial Officer have left the Company. In March of 2004, Dr. Sancilio, the Company's Executive Chairman and Chief Scientific Officer, was appointed Chief Executive Officer, and Gregory F. Rayburn, a senior managing director with FTI Consulting, was appointed Interim Chief Operating Officer. In April 2004, Timothy R. Wright was appointed President of the Company's Pharmaceuticals Products Division. Gina Gutzeit, a senior managing director with FTI Consulting, was appointed as interim Chief Financial Officer in May 2004.

The Company is fully committed to implementing controls identified by the Company's independent auditors and the Special Committee. The Company's efforts to strengthen its financial and internal controls continue, and the Company expects to complete remediation of the material weaknesses and reportable condition identified by its independent auditors by the end of 2004.

50. The Form 10-Q for the quarter ended March 31, 2004 also disclosed the extent of the government investigation into the fraudulent practices that occurred under the defendants' tenure. Specifically, the board had actual notice of an SEC inquiry as early as August 2003 and met with SEC representatives in September 2003, yet permitted the Company to issue false and misleading financials and guidance into February 2004 and did not even convene a "Special Committee" to investigate until March 2004:

Independent of the August 7, 2003 inquiry letter, on September 26, 2003, certain members of our board and management voluntarily met with, and provided documents to, the staff of the Enforcement Division. As a follow-up to this September 26, 2003 meeting and

as part of the inquiry initiated on August 7, 2003, on October 8, 2003, we received a further request from staff of the Enforcement Division for voluntary production of certain documents, to which we responded on October 30, 2003.

On January 14, 2004 and April 26, 2004, we received letters from the SEC's Division of Corporate Finance commenting on, asking questions about, and seeking additional disclosure with respect to certain of our periodic reports. We have responded to these letters.

In April 2004, in connection with an investigation conducted by the United States Attorneys Office for the Western District of North Carolina (the "U.S. Attorneys Office"), we received five federal grand jury subpoenas for document production and potential testimony related to, among other things, certain transactions regarding our 2002 and 2003 financial information, the terms, conditions of employment and compensation arrangements of certain of our senior management personnel, compensation and incentive arrangements for employees responsible for the sale of our Brethine, Darvocet, calcitriol, azathioprine and Darvon Compound products, quantities of the foregoing products in distribution channels, financial benefits with respect to specified corporate transactions to our senior management and others, certain loans obtained by us, extensions of credit, if any, by us to officers or directors, accounting for sales and returns of our foregoing products, our analysts' conference calls on financial results, internal and external investigations of pharmaceutical product sales activities, and related matters. We have also been advised that the SEC has initiated an inquiry into at least the same issues investigated by the Special Committee. The U.S. Attorneys Office has advised that we may also receive a subpoena from the SEC.

We and the Special Committee have agreed to cooperate fully with the government investigations, and the Special Committee has agreed to share all results of its investigation with the SEC and the U.S. Attorneys Office. To that end, two meetings of our outside counsel with attorneys for the U.S. Attorneys Office and the SEC have taken place and numerous documents as requested by these government agencies have been voluntarily produced. We have scheduled a third meeting with the U.S. Attorneys Office and the SEC in July in order to provide additional information related to the Special Committee's investigation to these government agencies. We and the Special Committee intend to facilitate any

interviews of our employees or officers that may be requested by these government agencies.

> The Department of Justice, SEC and other government agencies that are investigating or might commence an investigation of aaiPharma could impose, based on a claim of fraud, material misstatements, violation of false claims law or otherwise, civil and/or criminal sanctions, including fines, penalties, and/or administrative remedies. If any government sanctions are imposed, which we cannot predict or reasonably estimate at this time, our business, financial condition, results of operations or cash flows could be materially adversely affected. These matters have resulted, and are expected to continue to result, in a significant diversion of management's attention and resources and in significant professional fees.

## DEFENDANTS' DISCLOSURES VIOLATED GAAP

51. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

52. Defendants implicitly represented that the financial results they reported for the Company during the Relevant Period were prepared in accordance with GAAP, and explicitly represented that the reported results reflected all adjustments, consisting of normal recurring accruals, necessary for a fair presentation thereof. As specified above, however, defendants' representations concerning the Company's financial results during the Relevant Period were false and misleading in numerous material respects:

(a) Defendants falsely stated that the Company's financial statements fairly presented the Company's financial condition;

(b) Defendants failed to disclose that the Company's internal controls were grossly inadequate (while specifically representing that controls were adequate) and, as a result, the Company's ability to record, process, summarize, and report financial data in its financial statements was seriously deficient;

(c) Defendants violated the principle that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, §34);

(d) Defendants violated the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, §40);

(e) Defendants violated the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. That principle is particularly significant in the context of publicly-traded entities such as AaiPharma. The officers of such companies voluntarily accept wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, §50);

(f) Defendants violated the principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least in part, upon evaluations of past enterprise performance (FASB Statement of Concepts No. 1, §42);

(g) Defendants violated the principle that financial reporting should be reliable and represent what it purports to represent. The notion that information should be

reliable as well as relevant is central to accounting (FASB Statement of Concepts No. 2, §§58-59);

(h) Defendants violated the principle of completeness, which requires that nothing is left out of a company's financial statements that may be necessary to ensure that they validly represent underlying events and conditions (FASB Statement of Concepts, No. 2, §79); and

(i) Defendants violated the principle that conservatism must be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, §§95, 97).

53. Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## THE DIRECTOR DEFENDANTS' RESPONSIBILITY FOR INTERNAL ACCOUNTING CONTROLS AND FOR FINANCIAL REPORTING

54. All of the Director Defendants had the responsibility to ensure that there existed at aaiPharma sufficient internal controls to maintain the accuracy of its reported financial results, including revenue recognition. Defendants Ryan, Martin and Morrison, in particular, as members of the Audit Committee during the Relevant Period, had the responsibility to ensure that aaiPharma had sufficient accounting controls to insure the accuracy of its reported financial results. According to the Company's audit committee charter:

> - The audit committee shall provide assistance to the board of directors in fulfilling their oversight responsibility to the shareholders, potential shareholders, the investment community, and others relating to AAI's financial statements and the financial reporting process, the systems of internal accounting and financial controls, the annual independent audit of AAI financial statements,

> and the legal compliance and ethics programs as established by management and the board...
>
> - The primary responsibility of the audit committee is to oversee AAI's financial reporting process on behalf of the board and report the results of their activities to the board. the financial reports and other financial information provided by the Corporation to its stockholders, to any governmental body or to the public...
>
> - Also, the committee shall discuss with management and the independent auditors the adequacy and effectiveness of the accounting and financial controls, including AAI's system to monitor and manage business risk, and legal and ethical compliance programs...
>
> - The committee shall review the interim financial statements with management and the independent auditors prior to the filing of AAI's Quarterly Report on Form 10-Q. Also, the committee shall discuss the results of the quarterly review and any other matters required to be communicated to the committee by the independent auditors under generally accepted auditing standards. ...
>
> - The committee shall review with management and the independent auditors the financial statements to be included in AAI's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of Form 10-K), including their judgment about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity of the disclosures in the financial statements. Also, the committee shall discuss the results of the annual audit and any other matters required to be communicated to the committee by the independent auditors under generally accepted auditing standards.

55. Furthermore, as members of the audit committee, defendants Ryan, Martin and Morrison were charged, according to Appendix D to Statement on Auditing Standards No. 55, Consideration of the Internal Control Structure in a Financial Statement Audit ("SAS 55"), with objectives such as (i) making certain that "[t]ransactions are recorded as necessary . . . to permit preparation of financial statements in conformity with generally accepted accounting principles . . . and to maintain accountability for assets," and (ii) making certain that "[t]he recorded

accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

56. As described in SAS 55, the applicability and importance of specific control environment factors, accounting system methods and records and control procedures that an entity should establish should be considered within the context of such criteria as an entity's size, its organization and ownership characteristics, the nature of its business, the diversity and complexity of its operations, the entity's method of processing data, and its applicable legal and regulatory requirements. The larger the entity, the more complex, diverse and sophisticated the entity's business becomes, and the greater is the importance of accounting systems and controls. Moreover, public ownership of such an entity customarily requires a sophisticated internal control structure to ensure that transactions are accurately recorded and that, prior to the public disclosure of any financial information, such transactions are compared to the existing assets to eliminate any discrepancies between the recorded and actual amounts.

57. According to SAS 55:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions. [emphasis supplied].

58. When management permits a condition to exist in the company's internal control structure such that:

> the design or operation of one or more of the internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements . . . may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions,

such condition is defined by Statement on Auditing Standards No. 60, Communications of Internal Control Structure Related Matters Noted in an Audit ("SAS 60"), as a "material weakness" in the company's internal control structure.

59. Due to the Director Defendants' total abdication of their duties as members of the Board and/or the Audit Committee, they permitted material weaknesses in the Company's internal control structure such that the Company improperly recognized revenue and improperly accounted for the acquisition of certain of the Company's assets.

## INSIDER TRADING ALLEGATIONS

60. As a result of defendants' false and misleading statements, aaiPharma stock traded at artificially inflated levels through the Relevant Period. The Insider Trading Defendants knew or recklessly disregarded that revenues were being inflated through improper accounting.

61. Notwithstanding their access to this information as a result of their status as directors and/or officers of the Company and their corresponding duty either to refrain from trading or to disclose the adverse material facts set forth herein, the Insider Trading Defendants sold aaiPharma shares at artificially inflated prices while in possession of material, nonpublic information. This insider trading during the Relevant Period is summarized below:

| Name | Date | No. Shares Sold | Avg. Price | Approx. Proceeds |
|---|---|---|---|---|
| Frederick D. Sancilio | 8/13/02 | 1,200 | $20.00 | $ 24,000 |
| Subtotal | | 1,200 | | $ 24,000 |
| William H. Underwood | 3/4-5/03 | 20,000 | $21.25 | $426,000 |
| | 5/2/03 | 17,500 | $11.30 | $198,000 |
| | 5/5/03 | 32,500 | $11.05 | $359,000 |
| Subtotal | | 70,000 | | $983,000 |
| Totals | | 71,200 | | $1,007,000 |

## DERIVATIVE ACTION ALLEGATIONS

62. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23.1 on behalf of aaiPharma to enforce the claims of aaiPharma against the Individual Defendants, which may properly be asserted by aaiPharma and which aaiPharma has failed to enforce.

63. The continuing wrongs complained of herein occurred during the Relevant Period, during which time plaintiffs were aaiPharma shareholders. Plaintiffs continue to hold their shares in aaiPharma. Hence, plaintiffs have standing to bring this derivative action on behalf of aaiPharma to recover damages for all of the conduct described in this complaint.

64. Plaintiffs will fairly and adequately protect the interests of aaiPharma and its shareholders in enforcing the rights of aaiPharma against the Individual Defendants. Plaintiffs' attorneys are experienced in this type of litigation and will prosecute this action diligently on behalf of aaiPharma to insure the rights of the aaiPharma. Plaintiffs have no interests adverse to aaiPharma.

## THE INDIVIDUAL DEFENDANTS HAVE DAMAGED AAIPHARMA

65. By reason of their positions as fiduciaries of aaiPharma and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed to aaiPharma fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each defendant owed to aaiPharma a fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of good faith and fair dealing.

66. In addition, as officers and/or directors of a public company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to

the Company's operations, services, management, projections and forecasts so that the market price of the Company's common stock would be based, at all pertinent times, on truthful and accurate information.

67. The Individual Defendants either directly participated in the decisions to release the false and misleading press releases and SEC filings complained of herein, and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature, or knew or were reckless in not knowing that such violations were occurring, and took no action to prevent or remedy the situation.

68. Defendants caused aaiPharma to engage in a course of conduct which was designed to and did artificially inflate the market price of AaiPharma' securities and deceive the investing public regarding aaiPharma' financial reporting and business prospects. Defendants undertook this scheme to prolong the appearance of good fortune at aaiPharma, profit personally by trading while in possession of material, non-public information concerning the true financial condition of the Company, and maximize the value of their substantial personal holdings of aaiPharma stock.

69. Defendants either knew or were reckless in not knowing that the illegal acts and practices and misleading statements and omissions described herein would adversely affect the integrity of the market for aaiPharma' securities and would artificially inflate the prices of those securities. aaiPharma's stock reached over $31 per share during the Relevant Period, yet was trading at approximately $5 per share after the full truth regarding the Company's false financial statements was finally disclosed.

70. Defendants, by acting as alleged herein, in bad faith exposed AaiPharma to massive liability under the federal securities laws. As a result of the dissemination of the false and misleading statements described herein, the market price of aaiPharma' stock was artificially inflated. That has resulted in the Company being subjected to numerous class action lawsuits brought in the United States District Court for the Eastern District of North Carolina on behalf of purchasers of aaiPharma securities during the time the Company was disseminating the above quoted false information ("the Class Actions").

71. aaiPharma has been damaged by its exposure to multi-million dollar damages claims by the members of the classes in the Class Actions, as well as to the substantial legal and other professional expenses to be incurred in connection with the Class Actions. As a direct result of certain defendants' wrongful conduct and violations of the federal securities laws, aaiPharma has been forced to expend significant sums of money, including internal investigation costs of $3.2 million for the investigation described in the Company's Form 10-Q for the quarter ending March 31, 2004.

72. In addition, the Company's reputation in the securities markets has been severely damaged, thereby hampering the Company's ability to secure future business partners and financing.

## DEMAND IS EXCUSED FOR FUTILITY

73. Demand on AaiPharma to bring this action has not been made and is not necessary because such demand would be futile. aaiPharma is controlled by its Board of Directors. As described herein, the Director Defendants were actively involved in, knew or recklessly disregarded the adverse non-public material facts regarding aaiPharma alleged herein, and/or illegally profited from the misconduct. The Director Defendants, due to their participation in the wrongful acts alleged and their potential individual financial exposure, are not disinterested and cannot exercise independent business judgment on the issue of whether aaiPharma should prosecute this action. As a result, demand on aaiPharma and its Board of Directors is futile and therefore excused.

74. Among the facts demonstrating the futility of demand are the following:

(a) Defendants Sancilio, as Chairman of the Board, Chief Scientific Officer, and as one of the Company's largest individual shareholders, was actively involved in the day-to-day management of aaiPharma and was directly responsible for the acts and omissions described herein, including but not limited to the false and misleading statements and omissions of material facts made in aaiPharma public filings and statements. Defendant Sancilio sold shares of aaiPharma while in possession of material adverse inside information that the Company had

engaged in improper revenue recognition practices and that the price of the aaiPharma stock was therefore artificially inflated.

(b) Defendant Underwood sold 70,000 of shares of aaiPharma stock while in possession of material adverse inside information that the Company had engaged in improper revenue recognition practices and that the price of the aaiPharma stock was therefore artificially inflated. Thus, Underwood benefited from the artificial inflation his misconduct had created, in breach of his fiduciary duties of loyalty to aaiPharma and its shareholders. Underwood would never vote to investigate his own misconduct or to sue himself for his breaches of fiduciary duty.

(c) None of the other Director Defendants did anything to prevent the insider trading engaged in by defendants Underwood and Sancilio, as alleged herein. These directors knew of the unlawful acts, participated in the actions of their colleagues, and failed to prevent these breaches of the duty of loyalty. These directors would never sue themselves or their colleagues to recover said insider trading proceeds.

(d) During the Relevant Period, the Company's Audit Committee consisted of defendants Ryan, Martin and Morrison. The Audit Committee should properly have been the keystone of aaiPharma's corporate governance and finance. Instead, the Director Defendants, and defendants Ryan, Martin and Morrison in particular, failed to ensure that aaiPharma's Audit Committee was an informed, vigilant and effective overseer of the Company's financial reporting process and its internal control systems. The Director Defendants either knew or should have known that aaiPharma lacked an adequate system of internal controls. The service on the Audit Committee by defendants Ryan, Martin and Morrison was an utter sham in that they took no action whatsoever to assure that such a system of internal controls was in place, as demonstrated by the Company's March 1, 2004 announcement that the Company was investigating the timing of its revenue recognition and that its financial statements were in question.

(e) The so-called "Independent Committee," convened on March 1, 2004 to investigate improper revenue recognition, (chaired by defendant Landgraf and consisting of defendants Waters, Ryan, Martin, Gleberman, Morrison, and Avery, or 7 out of 9 total board

members), is incapable of properly investigating itself. Among the issues the "Independent Committee" (or the full board) will never be able to properly investigate:

i. Whether Independent Committee member Ryan was properly permitted to serve on the Audit Committee by consent of the full board, given his relationship with Independent Committee member Waters, as detailed above in Paragraph 11.

ii. Whether Independent Committee member Martin breached his fiduciary duties to the Company by failing to devote the proper amount of time and care to his responsibilities as director and member of the board's Audit Committee, Compensation Committee, and the Executive and Corporate Governance Committees given that Martin was a employed as a Vice President at Carolina Healthcare and served on the boards of three other corporations.

iii. Whether Independent Committee member Gleberman breached his fiduciary duties to the Company by failing to devote the proper amount of time and care to his responsibilities as a Company director given that Gleberman was a Managing Director at Goldman, Sachs & Co. and served on the boards of four other corporations.

iv. Whether the members of the board, including all the "Independent Committee" members, breached their fiduciary duties to the Company by failing to commence an independent committee investigation in August or September of 2003, when the SEC first requested documents and met with board members concerning possible financial irregularities at aaiPharma.

v. Whether the members of the board, including all the "Independent Committee" members, breached their fiduciary duties to the Company by approving lucrative consulting contracts for disgraced former aaiPharma CEO Tabbiner and CFO Ginna, who were the Company's top executives

during the Relevant Period when the improper financial reporting occurred.

vi. Whether "Independent Committee" members Ryan, Avery, Landgraf, and Martin breached their fiduciary duties as members of the Compensation Committee by approving and awarding performance based bonuses based on the Company's improperly inflated financial statements and sales revenues.

vii. Whether "Independent Committee" members Martin, Morrison, Landgraf, and Avery breached their fiduciary duties as members of the Executive and Corporate Governance Committee by implementing inadequate corporate governance policies and permitting serious breaches of the Company's existing corporate governance policies by key Company executives, officers, and directors.

(f) The "Independent Committee's" purported investigation of the accounting irregularities announced on March 1, 2004 is a sham in that Audit Committee members Ryan, Martin and Morrison are investigating themselves and their own failure to properly oversee and implement proper accounting controls. It defies logic that the Audit Committee members could perform an objective investigation of their own misconduct. The absence of internal controls directly contributed to the false financial disclosures alleged herein, and was the proximate cause of aaiPharma's exposure to massive liability for violation of federal securities laws.

(g) aaiPharma is and was controlled by its Board of Directors and as described herein, the Director Defendants are ultimately responsible for the Company's financial reporting, and were all involved in the wrongs alleged. These wrongs have given rise to the Class Actions, in which open market purchasers of aaiPharma stock have sued the Company and certain of the directors and/or officers asserting claims under the federal securities laws. None of the Director Defendants is in a position to exercise independent business judgment with respect to the claims alleged herein due to his participation in and responsibility for the conduct giving rise to the Class Actions, which have damaged and will continue to damage AaiPharma.

(h) aaiPharma has agreed to indemnify its directors and officers against liability for acts and omissions occurring in the performance of their duties as directors and officers and maintains insurance policies to cover the costs of such indemnification. Under the terms of those insurance policies, however, claims against directors which are brought by the Company, or other directors, are excluded from coverage. Therefore, aaiPharma's board, or any committee thereof, is effectively disabled from complying with any demand that would cause the Company to bring suit against the individual defendants because to do so would result in the loss of their insurance coverage.

(i) In order to bring this action for breaches of fiduciary duty, the members of aaiPharma's Board would have to sue themselves, and/or their fellow directors and allies in the top ranks of the Company. Five of the nine members of the board have been on the Board together for at least nine years, and defendant Sancilio, the Company's Chairman, is a founder of the Company. Defendant Ryan is vice president of Cetek Corporation, a drug discovery company of which defendant Waters is president and a substantial shareholder. The Director Defendants would therefore not initiate such litigation.

## FIRST CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS

75. Plaintiffs incorporate by reference the allegations set forth above.

76. In violation of their fiduciary duties to aaiPharma and its shareholders, defendants issued false and misleading statements to aaiPharma' shareholders and the investing public regarding the Company's results and business prospects throughout the Relevant Period. By reason of this conduct, defendants have exposed aaiPharma to potential liability in the Class Actions and the cost of defending such litigation. In addition, the Company's reputation in the securities markets has been severely damaged, thereby hampering the Company's ability to secure future business partners and financing.

77. Consequently, aaiPharma has been and is being further damaged by defendants' conduct in breach of their fiduciary duties, in an amount exceeding $75,000, exclusive of interest and costs.

## SECOND CAUSE OF ACTION

## GROSS NEGLIGENCE AGAINST ALL DEFENDANTS

78. Plaintiffs incorporate by reference the allegations set forth above.

79. The preparation and dissemination of quarterly and annual financial statements that were materially false and inaccurate and not in accordance with GAAP represents a sustained and systematic failure by the Individual Defendants to assure the existence within aaiPharma of appropriate and adequate internal financial controls and a reasonable information and reporting system necessary to assure the accuracy of the Company's financial reporting.

80. The breach by defendants of their duty to act with reasonable care was grossly negligent, reckless, and lacked a good faith effort by defendants to perform their fiduciary responsibilities.

81. Consequently, aaiPharma has been damaged by defendants' gross negligence and reckless disregard of their duties, in an amount exceeding $75,000, exclusive of interest and costs.

## THIRD CAUSE OF ACTION

## BREACH OF CONTRACT AGAINST INDIVIDUAL DEFENDANTS

82. Plaintiffs incorporate by reference the allegations set forth above.

83. In consideration of the substantial compensation and professional enhancement and prestige, which each of the defendants received as directors and/or officers of aaiPharma, each of those defendants contracted with aaiPharma to act in the best interest of aaiPharma and to cause aaiPharma to operate lawfully and properly.

84. Each defendant named as an aaiPharma officer had a written contract with aaiPharma which he breached by his actions, as set forth herein. Each of the Director Defendants

also had an express agreement to serve as a director of the corporation in exchange for compensation, which each Director Defendant breached by his actions herein.

85. By their actions and omissions set forth herein those defendants reached their contractual obligations and commitments to aaiPharma by not acting in the best interests of aaiPharma and causing or permitting aaiPharma to act in unlawful and improper ways.

86. Consequently, aaiPharma has been damaged by defendants' breach of their contracts, in an amount exceeding $75,000, exclusive of interest and costs.

## FOURTH CAUSE OF ACTION

## BREACH OF DUTY OF LOYALTY-INSIDER TRADING-AGAINST THE INSIDER TRADING DEFENDANTS

87. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

88. By reason of their positions as directors and/or officers of aaiPharma during the Relevant Period, at the time the Insider Trading Defendants sold their aaiPharma shares, each had access to and knew highly material information regarding aaiPharma, and knew or should have known that the public disclosure of this information would adversely affect the market price of aaiPharma's stock.

89. In selling their aaiPharma stock, as set forth above, the Insider Trading Defendants used aaiPharma's material, non-public information for personal gain, in breach of their fiduciary duties to aaiPharma and its shareholders.

90. By reason of the aforesaid insider sales, the Insider Trading Defendants profited through their fiduciary positions. Defendants are obliged to disgorge these unlawful profits for the benefit of aaiPharma. These unlawful profits exceed $75,000, exclusive of interest of costs.

## PRAYER FOR RELIEF

***WHEREFORE,*** plaintiffs, on behalf of aaiPharma, demand judgment against defendants, and each of them jointly and severally as follows:

A. determining that this suit is a proper derivative action and certifying plaintiffs as appropriate representatives of aaiPharma for said action.

B. declaring that each of the Individual Defendants breached his fiduciary duty to aaiPharma;

C. determining and awarding aaiPharma the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

D. awarding plaintiffs the costs and disbursements of this action, including reasonable fees and costs to plaintiffs' attorneys, accountants and experts;

E. granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

This the 26 day of August, 2004.

By: ______________________

Gary W. Jackson, NCSB # 13976
Gary V. Mauney, NCSB # 22190
LEWIS & ROBERTS, PLLC
128 South Tryon Street, Suite 1100
Charlotte, North Carolina 28202-5012
Telephone: (704) 347-8990
Facsimile: (704) 347-8929
*Attorneys for the Derivative Plaintiffs*

OF Counsel:

James E. Miller
SHEPHERD, FINKELMAN, MILLER & SHAH, LLC
1 Lewis Street
Hartford, CT 06103-2509
Telephone: (860) 246-0600
Facsimile: (860) 246-0700

Robert C. Schubert
Juden Justice Reed
Aaron H. Darsky
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, California 94111
Telephone: (415) 788-4220

**VERIFICATION**

I, Barbara Wisniewski, declare as follows:

I am the plaintiff in the foregoing derivative complaint. I have read the foregoing derivative complaint and know its contents. I am informed and believe and on that ground allege that the matters stated therein are true and correct.

I declare under penalty of perjury that the foregoing is true and correct. Executed this, the 24 day of July, 2004 at San Francisco, CA (city, state).

Barbara Wisniewski

Barbara Wisniewski

## VERIFICATION

I, Kenneth D. Vincent, declare as follows:

I am the plaintiff in the foregoing derivative complaint. I have read the foregoing derivative complaint and know its contents. I am informed and believe and on that ground allege that the matters stated therein are true and correct.

I declare under penalty of perjury that the foregoing is true and correct. Executed this, the 27th day of July, 2004 at OLD HICKORY, TN (city, state).

Kenneth D. Vincent
Kenneth D. Vincent